**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, | No. CV-18-00404-TUC-JGZ |
| Plaintiff, | **ORDER** |
| v. | |
| Deb Haaland,[1] et al., | |
| Defendants. | |

Over seventeen years ago, Plaintiff Center for Biological Diversity (CBD) petitioned the Fish and Wildlife Service (FWS or the Service) to list the distinct population segment (DPS) of the lower Colorado River basin roundtail chub as an endangered or threatened species under the Endangered Species Act (ESA ), 16 U.S.C. § 1531 et. seq.  In 2015, after two court actions initiated by CBD concerning FWS's delays acting on the petition, FWS ultimately proposed to extend the protections of the ESA to the lower Colorado River basin roundtail chub DPS as a threatened species.  However, in 2017, FWS withdrew the rule based on FWS's adoption of a taxonomic revision concerning the fish.  According to FWS, withdrawal of the proposed rule was necessary because, after the taxonomic revision, the lower Colorado River basin roundtail chub DPS no longer met ESA's definition of a species.  FWS also stated that under ESA's deadlines, it was required to make a listing decision at that time.

---

[1] Newly-confirmed Secretary of the Interior Deb Haaland is substituted in place of Defendant Ryan Zinke.  *See* Fed. R. Civ. P. 25(d).

1        CBD filed the instant action against the Secretary of the Interior and FWS,
2   challenging FWS's withdrawal of the proposed rule. CBD claims that even after the
3   taxonomic revision, the Colorado River basin roundtail chub is a listable entity and FWS's
4   decision not to list it as a DPS was arbitrary and capricious in violation of the
5   Administrative Procedure Act and ESA. (Doc. 1.)  CBD requests that the Court order FWS
6   to vacate the withdrawal of the proposed rule and to make a final determination regarding
7   the Lower Colorado River basin roundtail chub's status.
8        Pending before the Court are the parties' Cross-Motions for Summary Judgment,
9   which are fully briefed.  (Docs. 25, 26, 28, 29, 32, 34.)  The parties also filed supplemental
10  briefing based on the Supreme Court's recent decision in *Dep't of Homeland Sec. v.*
11  *Regents of the Univ. of Cal.*, __ U.S. __, 140 S. Ct. 1891, (June 18, 2020). (Docs. 35, 36.)
12  Upon consideration of the parties' filings, the Court will grant CBD's Motion for Summary
13  Judgment and deny Defendants' Cross-Motion for Summary Judgment.[2]

14  **I.   Applicable Standards**

15      **A. Summary Judgment**

16       Summary judgment is appropriate if the pleadings and supporting documents "show
17  that there is no genuine issue as to any material fact and that the moving party is entitled
18  to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.
19  317, 322 (1986). A court presented with cross-motions for summary judgment should
20  review each motion separately, giving the nonmoving party for each motion the benefit of
21  all reasonable inferences from the record. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles*
22  *Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008). "Summary judgment is a
23  particularly appropriate tool for resolving claims challenging agency action." *Defenders of*
24  *Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010). In such cases the Court's
25  role is not to resolve facts, but to "determine whether or not as a matter of law the evidence
26  in the administrative record permitted the agency to make the decision it did." *Occidental*
27  *Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

28

---

[2] This case is suitable for decision without oral argument. See LRCiv. 7.2(f).

1      **B. The Administrative Procedure Act**

2           Judicial review of agency actions under the ESA is governed by the Administrative

3    Procedure Act (APA). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th

4    Cir. 2002). Under the APA, the court may set aside agency action where it is found to be

5    arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable

6    law. 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if

7    the agency has relied on factors which Congress has not intended it to consider, entirely

8    failed to consider an important aspect of the problem, offered an explanation for its decision

9    that runs counter to the evidence before the agency, or is so implausible that it could not

10   be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

11   *Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

12          In order to determine whether an agency action is arbitrary and capricious, a

13   reviewing court looks to the evidence the agency has provided to support its conclusions,

14   along with other materials in the record, to ensure the agency made no clear error of

15   judgment. *See Judulang v. Holder*, 565 U.S. 42, 52–53 (2011); *Lands Council v. McNair*,

16   537 F.3d 981, 993 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Assns.,*

17   *Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). That task involves

18   examining the reasons for agency decisions, which must be based on non-arbitrary,

19   relevant factors that are tied to the purpose of the underlying statute. *See Judulang*, 565

20   U.S. at 53, 55. The agency must articulate a rational connection between the facts found

21   and the choice made. *Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1099

22   (9th Cir. 2003).

23          "An agency must defend its actions based on the reasons it gave when it acted."

24   *Dep't of Homeland Security*, 140 S.Ct. at 1909.  An agency seeking to justify its action

25   may not offer a new explanation for the action during the course of litigation, but must be

26   judged on the rationale and record that led to the decision.  *Ctr. for Biological Diversity v.*

27   *Lohn,* 296 F.Supp.2d 1223, 1231 (W.D. Wash. 2003), *vacated on other grounds as moot,*

28   511 F3d. 960 (9th Cir. 2007).  Under this standard, post hoc explanations of agency action

1    cannot substitute for the agency's own articulation of the basis for its decision.  *Arrington*

2    *v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008) (citing *Fed. Power Comm'n v. Texaco,*

3    *Inc.*, 417 U.S. 380, 397 (1974)).  Similarly, the reviewing court "may not supply a reasoned

4    basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs.*

5    *Ass'n*, 463 U.S. at 43.  Rather, the court's review is "limited to the explanations offered by

6    the agency in the administrative record." *Arrington*, 516 F.3d at 1113.

7         "The arbitrary and capricious standard is 'highly deferential, presuming the agency

8    action to be valid and [requires] affirming the agency action if a reasonable basis exists for

9    its decision.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)

10   (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).  When

11   examining scientific determinations, as opposed to simple findings of fact, a reviewing

12   court must generally be at its most deferential. *Baltimore Gas & Elec. Co. v. Natural Res.*

13   *Def. Council, Inc.*, 462 U.S. 87, 103 (1983). This is particularly true when the scientific

14   findings are within the agency's area of expertise. *See Ctr. for Biological Diversity v. Zinke*,

15   900 F.3d. 1053, 1067 (9th Cir. 2018); *Lands Council*, 537 F.3d at 993. Moreover, "[w]hen

16   not dictated by statute or regulation, the manner in which an agency resolves conflicting

17   evidence is entitled to deference so long as it is not arbitrary and capricious." *Trout*

18   *Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009).

19        Nevertheless, the APA requires a "substantial inquiry" to determine whether the

20   agency acted within the scope of its authority. *Citizens to Pres. Overton Park, Inc. v. Volpe*,

21   401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

22   99 (1977). Thus, although the agency is entitled to a "presumption of regularity," the effect

23   of that presumption is not to shield the agency's action from a "thorough, probing, in-depth

24   review," and the court's inquiry into facts should be "searching and careful." *Id.*

25   **II.    Statutory and regulatory framework:  The Endangered Species Act**

26        The Endangered Species Act (ESA or "the Act"), 16 U.S.C. § 1531, *et seq.*, sets

27   forth a comprehensive scheme for the protection of endangered and threatened species in

28   the United States. *Cal. ex rel. Lockyer v. United States Dep't of Agriculture*, 575 F.3d 999,

1018 (9th Cir. 2009).  To achieve its objectives, the ESA directs the Secretary of the Interior to determine which species of plants and animals are "threatened" or "endangered."  16 U.S.C. § 1533.[3]  The ESA defines "species" as including "any subspecies of fish or wildlife or plants, and *any distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature."[4]   16 U.S.C. § 1532(16) (emphasis added).   An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

**Distinct population segment.**  The ESA permits FWS to "designate a particular population segment of a species as a DPS [distinct population segment] and then consider that DPS as a species for listing purposes."  *Nat'l Ass'n of Home Builders v. Norton,* 340 F.3d 835, 842 (9th Cir. 2002) (citing 16 U.S.C. §§ 1532(16), 1533(a)(1)).  Because the ESA does not define "distinct population segment," FWS follows a binding policy statement[5] to guide determinations of whether a DPS warrants listing under the ESA. (*See* D000752-55.)[6]  The DPS Policy requires that a DPS must be "discrete" and "significant." (D000755.)   The DPS Policy requires evaluation of three elements when determining whether a population is a DPS that meets the definition of an endangered or threatened species:

---

[3] The Secretary's duties under the ESA are delegated to FWS pursuant to 50 C.F.R. § 402.01(b).

[4] FWS's implementing regulations further clarify that "[a]ny species or taxonomic group of species (e.g., genus, subgenus) ... is eligible for listing under the [ESA]." 50 C.F.R. § 424.11(a).

[5] The DPS Policy was jointly promulgated by FWS and National Marine Fisheries Service, which is responsible for implementing the ESA with respect to marine and anadromous species. *Nat'l Ass'n of Home Builders,* 340 F.3d at 842.

[6] All citations to exhibits in this Order are to the administrative record unless otherwise noted.  The parties categorized the materials in the administrative record as Emails (E), Documents (D) and References (R), and these designations are reflected in the Court's citations.  Many of the documents in the administrative record are also published in the Federal Register.  For the purposes of this Order, the Court has elected to include only the administrative record citation.

    (1)     Discreteness of the population segment in relation to the remainder of the species to which it belongs[7];

    (2)     The significance of the population segment to the species to which it belongs; and

    (3)     The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

(*Id.*)

Additionally, in determining whether to list a species, including a DPS, as threatened or endangered, the ESA requires FWS to consider:

    (A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

    (B)    overutilization for commercial, recreational, scientific, or educational purposes;

    (C)    disease or predation;

    (D)    the inadequacy of existing regulatory mechanisms; or

    (E)    other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Any one of these five factors, or combination of them, may support a listing determination. *Kern Cnty. Farm Bureau*, 450 F.3d at 1075. Listing decisions, including withdrawals, must be based "solely on the best scientific and commercial data available . . . after conducting a review of the status of the species. . . ." 16 U.S.C. § 1533(b)(1)(A).

The ESA provides two methods for listing species for protection as endangered or threatened. 16 U.S.C. § 1553. The first allows the Secretary to act on his own initiative to identify species for protection. 16 U.S.C. § 1533(a). The second "allows interested citizens to compel the Secretary's consideration of a species by filing a petition." *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne,* 531 F.3d 792, 804 (9th Cir. 2008) (citation omitted); *see also* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14. There are important differences between the two methods that dictate how and when the Secretary must act. *Coos Cnty.*

---

7 A population is "discrete" if it is "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." (D000755.) "Quantitative measures of genetic or morphological discontinuity may provide evidence of separation." (*Id.*)

*Bd. of Cnty. Comm'rs*, 531 F.3d at 804.   Under the first method, the Secretary has considerable discretion to consider whether a species is eligible for listing and to set a schedule for listing it.   *Id.*   The second method, by contrast, "replace[s] the Secretary's discretion with mandatory nondiscretionary duties."   *Id.* at 808 (internal quotation marks and citation omitted).   The Secretary must act on a petition within certain mandatory deadlines.  16 U.S.C. § 1533(b)(3).

**90-day finding requirement upon the filing of a petition.**  Upon receipt of a petition, the Secretary must review the petition and, "[t]o the maximum extent practicable," within 90 days make a finding (90-day finding) as to whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1). "Substantial information" refers to credible scientific or commercial information that would lead a reasonable person to conclude that the measure proposed in the petition may be warranted. 50 C.F.R. § 424.14(h)(i).

**12-month finding requirement.**  If the Secretary concludes that the petition presents substantial information indicating that a listing may be warranted, the Secretary must "promptly commence a review of the status of the species concerned[,]" and promptly publish its findings. 16 U.S.C. § 1533(b)(3)(A)-(B). Within twelve months of receipt of the petition, the Secretary must determine whether listing of the species is "not warranted," "warranted," or "warranted . . . but precluded" by other listing priorities. 16 U.S.C. § 1533(b)(3)(B).  The 90-day and 12-month findings are not subject to notice-and-comment rulemaking. *See* 16 U.S.C. § 1533(b)(3).

**Process when action is warranted.**  If the Secretary concludes that the petitioned action is warranted, FWS must, publish in the Federal Register a general notice and the complete text of the proposed regulation.  16 U.S.C. §§ 1533(b)(3)(B)(ii), 1533(b)(5)(A)(i). Publication must occur at least ninety days before the effective date of the regulation.  16 U.S.C. § 1533(b)(5)(A).  A period of public comment follows.  16 U.S.C. § 1533(b).

Within one year of the date of the notice of publication, the Secretary must either

publish a final rule designating the species for protection or, if it finds that "available evidence does not justify the action," withdraw the proposed rule. 50 C.F.R. § 424.17(a)(iii); *see also* 16 U.S.C. § 1533(b)(6). The Secretary may, however, extend the one-year period up to six months "for purposes of soliciting additional data" in cases where "there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." 16 U.S.C. §§ 1533(b)(6)(A)(i)(III), (b)(6)(B)(i). If the one-year period is extended, and the agency decides to withdraw the regulation because "there is not sufficient evidence to justify the action proposed by the regulation," the agency must publish notice of the withdrawal together with the finding on which the withdrawal is based. 16 U.S.C. § 1533(b)(6)(B)(i)-(iii). The agency's finding in support of withdrawal is judicially reviewable. 16 U.S.C. § 1533(b)(6)(B)(ii).

## III.  Background

### A.  Factual Background

#### 1.  The Lower Colorado River Basin Roundtail Chub

Roundtail chub (*Gila robusta*) are minnows of the family Cyprinidae. (Doc. 27, ¶ 1; Doc. 31, ¶ 1.) Within that family, the roundtail chub is part of the *Gila robusta* complex or species group. (Doc. 27, ¶ 2; Doc. 31, ¶2.) The taxonomic history of the various species within the *Gila robusta* complex has been a source of longstanding and ongoing debate. (Doc. 27, ¶ 9; Doc. 31, ¶ 9.) Endemic to the Colorado River basin, the complex was comprised of seven taxa: bonytail chub (*Gila elegans*); humpback chub (*Gila cypha*); Virgin chub (*Gila seminuda*); Pahranagat roundtail chub (*Gila jordani*); Gila chub (*Gila intermedia*); roundtail chub (*Gila robusta*); and headwater chub (*Gila nigra*). (Doc. 27, ¶¶ 3, 10 ; Doc. 31, ¶¶ 3, 10.) Currently, the bonytail, humpback, Virgin, Pahranagat, and Gila chub are all listed under the ESA. (Doc. 27, ¶ 11; Doc. 31, 11¶.)

Researchers over the decades have variously classified the *Gila* entities as "full species, . . . as different species, [as] subspecies of *Gila robusta*, or as part of a '*Gila robusta complex*.'" (Doc. 30, ¶ 5; Doc. 33, ¶ 5.) From the 1800s until 2016, the roundtail

chub, headwater chub, and Gila chub were formally recognized as distinct taxonomic species.  (Doc. 27 ¶¶ 12, 13; Doc. 31, ¶¶ 12, 13.)  In 2015, FWS recognized the headwater chub and lower Colorado river basin roundtail chub DPS as separate species when proposing to list them as threatened species.  (Doc. 27, ¶ 13; Doc. 31, ¶13.)

Following the proposed rule, at the request of the State of Arizona Game and Fish Department (AGFD), the American Fisheries Society and American Society of Ichnthyologists and Herpetologists Joint Committee on the Names of Fishes ("Joint Committee") met to determine whether the Gila chub, headwater chub, and roundtail chub remained discrete species.[8]  (Doc. 27, ¶ 14; Doc. 31, ¶ 14.)  This resulted in a report concluding that "the data available support recognition of only one species of *Gila*, the Roundtail Chub" and "do not support recognition of three species . . . , i.e., the Roundtail Chub, *Gila  robusta*; Gila chub, *Gila intermedia*; and Headwater Chub, *Gila nigra*."  (Doc. 27, ¶ 15; Doc. 31, ¶ 15.)  The report relied primarily on two sources:  Carter et al. (2016) and Copus et al. (2016).  (Doc. 27, ¶ 16; Doc. 31, ¶ 16.)  Peer reviewers of the withdrawal noted serious concerns with both sources including that the sources had not undergone peer review; were not available for public consideration at the time; and there existed conflicting data and conclusions in other reports pertaining to morphological identification, DNA analysis, and ecological equivalency.  (Doc. 27, ¶ 17; Doc. 31, ¶ 17.)  The peer reviewers also criticized Copus et al.'s "methods and conclusions, particularly small sample size, lack of key analytical and laboratory steps, the study's DNA sequence data filtering and analyses that failed to follow best practices for phylogenetic analysis, and specimen shrinkage associated with duration of preservation impacting morphological diagnostics."  (Doc. 27, ¶ 17 (quoting D000748); Doc. 31, ¶ 17.)  The Service, after internal deliberation, adopted the Joint Committee's finding; the Service then withdrew the proposed rule to list the headwater chub and lower Colorado River basin roundtail chub DPS.  (Doc. 27, ¶ 17; Doc. 31, ¶ 17; *see also* D000744-000750.)

---

[8] The Joint Committee is the recognized authority in establishing the taxonomic status of fish.  (Doc. 30, ¶ 35; Doc. 33, ¶ 35.)

1

2

**2.      The population and range of the roundtail, headwater, and Gila chubs in the lower Colorado River basin**

3      The roundtail chub, headwater chub, and Gila chub are all found in the lower

4   Colorado River basin, with the latter two species limited to the lower basin.  (Doc. 26, p.

5   13.)  Roundtail chub in the lower Colorado River basin occupied the drainage basins of the

6   Bill Williams, Gila, Little Colorado, Salt, and Verde rivers, while the headwater chub was

7   found only in the Gila, Salt, and Verde river drainages.  (Doc. 27, ¶ 18; Doc. 31, ¶ 18.)

8   Gila chub were found in Gila, Salt, Verde, Santa Cruz, San Pedro, San Carlos, San Simon,

9   San Francisco, and Aqua Fria drainages across Arizona and New Mexico.  (Doc. 27, ¶ 19;

10  Doc. 31, ¶ 19.)

11     From the 1800s to 2016, the roundtail chub's historic range in the lower Colorado

12  River basin was found to have been greatly reduced and damaged. (Doc. 27, ¶ 20; Doc. 31,

13  ¶ 20 (citing pre-2016 findings that the headwater chub has been eliminated from 52% of

14  its historic range; the lower Colorado River basin roundtail chub DPS has been eliminated

15  from 57% of its historic range; and the Gila chub has been eliminated from 85% to 90% of

16  its range).) During this same time period, it was found that livestock grazing damaged a

17  significant majority of the lower Colorado River basin roundtail chub's range by removing

18  riparian vegetation, increasing erosion and decreasing bank stability, and generally

19  degrading the roundtail chub's natural habitat.[9]  (Doc. 27, ¶ 21; Doc. 31, ¶ 21.)  Similarly,

20  non-native fish, introduced for various reasons, have "led to significant losses of Gila chub"

21  due to competition and predation.  (D000775; *See also* Doc. 27, ¶ 22 (citing D000775);

22  Doc. 33, ¶ 22 (citing D000775).)

23  _____

24     [9] Defendants acknowledge that the 2015 Species Status Assessment Report for the
    Headwater Chub and Lower Colorado River Distinct Population Segment of Roundtail

25  Chub found that poorly managed livestock grazing in the past has caused such damage, but
    note that the Assessment also found "the capability exists to create livestock grazing

26  strategies that are compatible, and even complimentary to maintaining fisheries habitat,
    although more research is needed in this regard."  (Doc. 31, ¶ 21.)  The Assessment

27  recognized that livestock grazing on federal and tribal lands has been modified to reduce
    or eliminate long-term adverse effects.  (*Id.*)  "Consequently, even though all streams

28  containing chub populations are surrounded by grazing allotments, impacts from grazing
    are limited and data does not indicate population level impacts are occurring or will occur."
    (*Id.*)

The 2015 proposed rule for the Threatened Species Status for the Headwater Chub and Roundtail Chub DPS states that: "'changes in water flows caused by human activities (either surface water diversion or groundwater pumping) and climate change, leading to a reductions [sic] in water availability, have led to reduction in chub abundance and habitat quality and quantity.'" (Doc. 31, ¶ 23 (quoting D000570); Doc. 27, ¶ 23 (citing D000570.))

Defendants generally agree with CBD's assertion that the lower Colorado River basin roundtail chub populations have become fragmented and small. (Doc. 31, ¶ 24; *see also* Doc. 27, ¶ 24.) However, Defendants contend that "not all remaining populations are small" and that CBD's statement was based on information prior to the Joint Committee's 2016 taxonomic revision. (Doc. 31, ¶ 24.)

### 3.     Various threats imperil the roundtail, headwater and Gila chub's existence

CBD asserts that the lower Colorado River basin roundtail chub, headwater chub, and Gila chub's continued existence in their remaining range is threatened by the same underlying threats. Specifically, non-native aquatic species are the current primary threat to the chubs, as they prey on young chubs and outcompete them for resources in all life stages. (Doc. 27, ¶ 25 (noting non-native species pose the primary threat to roundtail and headwater chubs, and noting impacts on the Gila chub from non-native species); Doc. 31 ¶ 25.)) The parties agree that non-native species have led to significant declines in native fish. (Doc. 27, ¶ 27; Doc. 31 ¶ 27.). The parties also generally agree that climate change is expected to increase the threat of non-natives because decreased water availability increases interactions and competition between native and non-native fish. (Doc. 27, ¶ 28; Doc. 31, ¶ 28.)

Water is the chubs' basic habitat component. (Doc. 27, ¶ 29; Doc. 31, ¶ 29.) Reduction in water availability can lead to increased fragmentation as streams dry up and contract. (Doc. 27, ¶ 30; Doc. 31, ¶30.) Human water withdrawals, either through surface water diversions or alluvial groundwater pumping, decrease the availability of water. (Doc. 27, ¶ 31; Doc. 31, ¶ 31). As the human population in the chubs' range continues to grow,

these withdrawals are expected to increase.  (Doc. 27, ¶ 32; Doc. 31 ¶ 32.)  Additionally, man-made dams, which the chubs cannot cross, create reservoirs that are uninhabitable. (Doc. 27, ¶ 33; Doc. 31, ¶ 33.)

"'Chubs are impacted not only by the quantity and quality of water, but also by the timing and spatial distribution of water.  There is a strong temporal component to the amount of water available in a stream.'" (Doc. 31, ¶ 34 (quoting D000350); *see also* Doc. 27, ¶ 34.)  Climate change is expected to change both the timing and amount of snowmelt as well as the amount of precipitation from monsoons.  (Doc. 27, ¶ 35; Doc. 31, ¶ 35.) Changes in the timing or amount of water can prevent spawning, limit access to critical breeding areas, and increase genetic isolation resulting in potential inbreeding among other things.  (Doc. 27, ¶ 36; Doc. 31, ¶ 36.)

The parties agree that several of the categories of risk listed by CBD threatened population levels in the past, but Defendants assert that not all categories listed are currently affecting the species because new and future management directions are considering these risks, particularly livestock grazing, roads management, channelization of streams, and forestry practices.  (Doc. 31, ¶ 37.)  Defendants concede, however, that the final rule listing the Gila chub noted that "'[e]xisting regulatory mechanisms have not been adequate to prevent the continuing decline of Gila chub.'"  (Doc. 31, ¶ 38 (quoting D000776).)  Defendants note that the proposed rule to list the headwater chub and lower Colorado River basin roundtail chub DPS did not make an explicit finding related to regulatory mechanisms.  (Doc. 31, ¶ 38.)

### B.    Procedural Background

As set forth below, efforts to obtain ESA protection for the Gila, headwater, and lower Colorado River basin roundtail chub DPS have been fraught with delay.

### 1.    Gila Chub

As early as 1982, FWS placed the Gila chub on the list of candidate species under category 1.  "Category 1 [a term no longer used] comprise[d] taxa for which the Service . . . ha[d] substantial information on hand to support the biological appropriateness

- 12 -

of proposing to list the species as Endangered or Threatened. . . . Development and publication of proposed rules on such species [was] anticipated."[10]  47 Fed. Reg. 58454 (Dec. 30, 1982).  In 1998, after more than 15 years passed without FWS making a decision whether to list the Gila Chub on its own initiative, CBD petitioned FWS to list the Gila chub as endangered.  (Doc. 27, ¶ 40; Doc. 31, ¶ 40.)  In response, FWS informed CBD that it considered the Gila chub's listing warranted but precluded by other higher priority actions.  (Doc. 27, ¶ 41; Doc. 31, ¶ 41.)  CBD challenged this determination, and the Ninth Circuit Court of Appeals rejected FWS's finding.  (Doc. 27, ¶ 42; Doc. 31, ¶ 42.)  In 2001, CBD and FWS settled subsequent litigation further addressing the Ninth Circuit's ruling.  (Doc. 27, ¶ 43; Doc. 31, ¶ 33.)  The settlement agreement required FWS to publish a proposed rule to list the Gila chub as endangered by July 31, 2002.  (Doc. 27, ¶ 43, Doc. 31, ¶ 43.)  On August 9, 2002, FWS published the proposed rule, which constituted its 12-month finding for the petition to list the Gila chub.  (Doc. 27, ¶ 43; Doc. 31, ¶ 43.)  In November 2005, FWS listed the Gila chub as endangered and designated critical habitat for that species.  (Doc. 27, ¶ 44; Doc. 31, ¶ 44.)

In light of the 2016 taxonomic revision, the AGFD requested that FWS delist the Gila chub as it is no longer recognized as a separate species.  (Doc. 27, ¶ 70; Doc. 31, ¶ 70.)  Additionally, in 2017, internal FWS memoranda recommended delisting the Gila chub.  (Doc. 000741.)  In the withdrawal of the proposed rule at issue here, FWS stated that it intended to reevaluate the status of the currently-listed Gila chub.  (D000750.)

### 2.    The roundtail chub and headwater chub

FWS recognized the possibility that the roundtail and headwater chubs might qualify for ESA protection as early as 1982 when FWS placed both species on the list of candidate species as category 2 species.  (Doc. 27, ¶ 39; Doc. 31, ¶ 39.)  "Category 2 species

---

[10] Beginning in 1996, FWS discontinued the designation of multiple categories of candidates, and only those taxa meeting the definition for former category 1 candidates, like the Gila chub, were considered candidates for listing purposes.  Endangered and Threatened Wildlife and Plants; Listing the Gila Chub as Endangered With Critical Habitat, 67 Fed. Reg. 51948, 51,949-50 (Aug. 9, 2002).  The Gila chub was approved as a candidate on August 17, 1997, and was included in the candidate Notices of Review published in 1997, 1999, 2001, and 2002.  *Id.* at 51,950.

were those for which information in the Service's possession indicated that proposing to list was possibly appropriate, but for which substantial biological data to support a proposed rule were lacking." (D000563.)  The roundtail and headwater chubs maintained this status until the practice of identifying candidate 2 species was discontinued in 1996. (D000563.)  At that time, they were "removed from the candidate list and no longer recognized under the Act."  (*Id.*)

> **a.    CBD's petition to list the roundtail chub and the headwater chub**

In 2003, CBD petitioned (the Petition) to list the lower Colorado River basin roundtail chub distinct population segment (LCR roundtail chub DPS) and the headwater chub—the only chubs within the *Gila robusta* complex lacking ESA protection.  (Doc. 27, ¶¶ 45, 46; Doc. 31, ¶¶ 45, 46; Doc. 30, ¶ 9; Doc. 33, ¶ 9.)  FWS agrees that CBD's petition demonstrated that the headwater chub and lower Colorado River basin roundtail chub DPS experienced severe declines from "habitat loss and degradation related to livestock grazing, dams, diversions, groundwater pumping, mining, recreation, and human population growth, competition and predation from non-native fish, and inadequate existing laws and regulations."  (Doc. 27, ¶ 46; Doc. 31, ¶ 46.)

> **b.    Litigation to compel FWS to respond to CBD's petition**

Due to funding constraints, FWS failed to make a timely 90-day finding concerning CBD's Petition.  (Doc. 27, ¶ 47; Doc. 31, ¶ 47; Doc. 30, ¶ 12; Doc. 33 ¶ 12.)  After more than a year passed following the Petition's submission, CBD filed suit against the Service for failing to make the required 90-day finding.  (Doc. 27, ¶ 48; Doc. 31, ¶ 48.)  The parties subsequently entered into a stipulated settlement agreement in which FWS agreed to issue a 90-day finding by June 30, 2005 and a 12-month finding by April 6, 2006.  (Doc. 27, ¶¶ 49, 50; Doc. 31, ¶¶ 49, 50; Doc. 30 ¶ 13; Doc. 33, ¶ 13.)  FWS issued a 90-day finding that the Petition presented substantial scientific information demonstrating that listing the LCR roundtail chub DPS and headwater chub may be warranted.  (Doc. 27, ¶ 49; Doc. 31 ¶ 49.)

After conducting a status review, FWS issued the 12-month finding that listing was

"warranted but precluded" for the headwater chub and "not warranted" for the lower Colorado River basin roundtail chub DPS.  (Doc. 27, ¶ 51; Doc. 31, ¶ 51.)  CBD filed suit challenging this finding.  (Doc. 27, ¶ 52; Doc. 31, ¶ 52; Doc. 30, ¶ 18; Doc. 33, ¶ 18.)  In 2007, the parties entered into a stipulated settlement agreement in which FWS agreed to commence another status review of the LCR roundtail chub DPS and make a 12-month finding by June 30, 2009.  (Doc. 27, ¶ 52; Doc. 31, ¶ 52; Doc. 30, ¶ 19; Doc. 33, ¶ 19.)

In July 2009, FWS found that listing the LCR roundtail chub was "'warranted but precluded' by other 'higher priority actions.'"[11]   (Doc. 27, ¶ 53 (quoting D000139); Doc. 31, ¶ 53.)   In concluding that the listing was warranted, FWS found "'that the lower Colorado River populations are discrete from the upper Colorado River basin populations on the basis of their present and historical geographic separation of 275 river mi (444 km) and because few historical records have been detected in the mainstem Colorado River between the two populations centers that would confirm significant connectivity historically.'"  (Doc. 33, ¶ 20 (quoting D000142); Doc. 30, ¶ 20.)  FWS also found "'that the lower Colorado River basin roundtail chub is significant because of its unique ecological setting compared to the upper basin, and because the loss of the species from the lower basin would result in a significant gap in the range of the species.'"  (Doc. 33, ¶ 20 (quoting D000142).)  FWS stated that the species would be added to the candidate species list and that it would develop a proposed rule to list the roundtail chub DPS pursuant to the Listing Priority System.  (Doc. 30, ¶ 21; Doc. 33, ¶ 21.)  Over two years passed and FWS did not develop the proposed rule.

### c.     The October 2015 proposed rule to list the Lower Colorado River basin roundtail chub DPS and headwater chub

In 2011, CBD and FWS reached a stipulated settlement agreement in multi-district

---

[11] Although Defendants agree with this statement, they clarify that CBD's assertion "fails to differentiate that the Service's 2009 finding was based on the taxonomy of the species at the time and fails to acknowledge that this DPS finding occurred before the Joint Committee's 2016 taxonomic revision."  (Doc. 31, ¶ 53.)  Defendants raise similar objections to many of CBD's statements of fact describing the factual and procedural background.  In setting forth and discussing the historical facts, the Court recognizes that certain findings preceded the 2016 taxonomic revision.

1    litigation requiring the agency to make overdue decisions pertaining to hundreds of species,

2    including the headwater chub and LCR roundtail chub DPS by 2015.  (Doc. 27, ¶ 55; Doc.

3    31, ¶ 55; Doc. 30, ¶ 22; Doc. 33, ¶ 22.)

4         In October 2015, over a decade after CBD filed its petition, the Service proposed to

5    list both species as threatened. (Doc. 30, ¶ 23; Doc. 33, ¶ 23; *see also* Doc. 27, ¶ 56; Doc.

6    31, ¶ 56.)  In the proposed rule, the Service determined that:

7         . . . headwater chub and lower Colorado River basin roundtail chub DPS meet
          the definition of threatened species primarily because of the present or
8         threatened destruction of their habitat or range and other natural or manmade
          factors resulting mainly from impacts from nonnative aquatic species,
9         reduction of habitat (*i.e.*, water availability), and climate change.
10

11   (Doc. 27, ¶ 56 (quoting D000562); Doc. 31, ¶ 56.)

12        FWS also reaffirmed that the lower Colorado River basin roundtail chub constituted

13   a DPS. (Doc. 27, ¶ 57; Doc. 31, ¶ 57.)  Specifically, the Service determined that "[t]he

14   lower Colorado River basin roundtail chub population segment meets the element of

15   discreteness because it was separate historically, and continues to be markedly separate

16   today."  (Doc. 27, ¶ 58; Doc. 31, ¶ 58.)  FWS also found that "the lower Colorado River

17   basin roundtail chub is significant because of its unique genetic lineage, which differs

18   markedly from the upper basin, and that the loss of the species from the lower basin would

19   result in a significant gap in the range of the species."  (Doc. 27, ¶ 59; Doc. 31, ¶ 31.)

20   Therefore, "[b]ecause this population segment meets both the discreteness and significance

21   elements of [the Service's] DPS policy, the lower Colorado River population segment of

22   the roundtail chub qualifies as a DPS . . . and, as such, is a listable entity under the ESA."

23   (Doc. 27, ¶ 60; Doc. 31, ¶60.)

24        **d.    Delay between the proposed rule and the withdrawal**

25        On October 7, 2015, FWS published the proposed rule, reaffirming the July 7, 2009

26   12-month finding that the roundtail chub in the lower Colorado River basin met the

27   definition of a DPS, and proposed adding that DPS to the list as a threatened species.  (Doc.

28   30, ¶ 23; Doc. 33, ¶ 23; *see also* D000562-D000591.)  The proposed rule provided for a

two-month period to "'seek comments from independent specialists to ensure that our determinations are based on scientifically sound data, assumptions, and analysis.'" (Doc. 30, ¶ 24 (quoting D000562); Doc. 33, ¶ 24; *see also* D000561.) FWS sent the species status assessment and proposed rule to various specialists for peer review. (Doc. 30, ¶ 25; Doc. 33, ¶ 25.)

On October 7, 2015, the same day the proposed rule was published, AGFD sent a letter to FWS stating that it had ""staff working long hours'" to review the proposed rule and the accompanying species status assessment. (Doc. 27, ¶ 65 (quoting E020352); Doc. 31, ¶ 65.) Citing the complexity of the species status review, which contained "modeling that . . . staff is unfamiliar with," AGFD requested at least an additional 60-days to comment. (E020352; *see also* Doc. 27, ¶ 65 (noting request for extension); Doc. 31, ¶ 65.)

Some commenters, including the New Mexico Department of Game and Fish, requested that the Service delay publication of the final rule pending completion of additional taxonomic analyses of the chub complex, noting recent studies documenting "significant overlap among taxa[.]" (Doc. 30, ¶ 27; Doc. 33, ¶ 27.) In October 2015, AGFD requested that the Joint Committee evaluate the taxonomy of the three *Gila* species in the lower Colorado River basin.[12] (Doc. 30, ¶ 29; Doc. 33, ¶ 29.) AGFD agreed to cover the travel expenses of Committee members "in an effort to assist assembling the maximum number of members as possible to ensure a thorough evaluation was conducted; no remuneration was provided for Committee members." (Doc. 30, ¶ 30 (quoting D000727); Doc. 33 ¶ 30.)

During this time period, FWS engaged in discussion about alternative DPS configurations and the effect of such. In March 2016, FWS personnel discussed whether there were three distinct population segments of roundtail chub (Little Colorado, Bill

---

[12] The record shows that in May 2015, AGFD informed the Joint Committee of AGFD's position that the chub complex should be classified as a single species. (D000300-06.) AGFD requested that the Joint Committee convene a workshop or panel to determine, among other things, whether the three species classification (roundtail, headwater, and Gila chub) remained valid. (D000306.)

Williams and Gila Basin) instead of one in the lower Colorado River Basin.  (E031301[13]; see also Doc. 34, p. 13 (citing E031301).)   Additionally, in July 2016, FWS personnel discussed comments received concerning the configuration of the DPS for the roundtail chub.   (E031340-E031341.)   In discussing possible alternative DPS configurations, including "separate DPS for the LCR populations" they noted that additional analysis would be necessary to determine if a potential LCR DPS could be significant and any change in DPS boundaries would require republication of a proposed rule for notice and comment.  (*Id*.) It was decided "to stay the course for now with one the DPS. . . . We have some time to make a final decision, but if we were going to propose changing the DPS boundaries we should decide fairly soon as it would require a fair amount of reconsideration of our processes in terms of public notices, management briefings, etc." (E031341.)[14]

On April 4, 2016, the Joint Committee met with a panel of experts, who presented their recent findings on genetics and morphological studies conducted over the past ten years. (Doc. 30, ¶ 31; Doc. 33, ¶ 31.)

**FWS's 6-month extension of determination and comment period.**

On August 15, 2016, FWS announced a six-month extension of the determination whether the headwater chub and roundtail chub DPS are threatened species, and reopened the comment period for 30 days.  (Doc. 30, ¶ 32; Doc. 33, ¶ 32.)  FWS reopened the comment period for the proposed rule based on its "finding that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to our proposed regulations to add these species to the List of Endangered and Threatened

---

[13] Defendants state that these discussions occurred "after the issuance of the proposed rule but before the taxonomic revision."  (Doc. 34, p. 13.)  In the index of documents E031295-E031301, "Roundtail chub (*Gila robusta*) DRAFT DPS White Paper", is dated March 28, 2016.

[14] Defendants cite the documents discussed in this paragraph in their Reply and request that the Court excuse their non-compliance with LRCiv 56.1(e) (requiring factual citation in the briefs to the specific paragraph number of the statement of facts).  (Doc. 34, p. 13.) Because the documents were contained in the administrative record and are relevant to the issues presented, the Court will consider the materials.

Wildlife[.]" (Doc. 30, ¶ 33; Doc. 33, ¶ 33.)  FWS explained that, during the initial public comment period for the proposed rule, it received comments questioning the taxonomic distinctness of the headwater chub and the roundtail chub DPS. (Doc. 30, ¶ 34; Doc. 33, ¶ 34.)  FWS also noted that the recognized authority in establishing the taxonomic status of fish, the Joint Committee, had agreed to evaluate the roundtail, headwater, and Gila chub taxonomy and that a report was forthcoming. (Doc. 30, ¶ 35; Doc. 33, ¶ 34.)

**The Joint Committee's taxonomic revision.**

On September 1, 2016, the Joint Committee released its final report on the taxonomy of Gila in the Lower Colorado River basin of Arizona and New Mexico, concluding that "'the data available support recognition of only one species of *Gila*, the Roundtail Chub, *G. robusta*,'" and "do not support recognition of three species . . . . , i.e., the Roundtail Chub, *Gila robusta*; Gila Chub, *Gila intermedia; . . .*  and the  Headwater Chub, *Gila nigra*.'" (Doc. 27, ¶ 15 (quoting E028932); Doc. 31, ¶ 15; *see also* Doc. 30, ¶ 36; Doc. 33, ¶ 36.)  The Joint Committee explained that this conclusion was based on the review of data and analyses published in studies and information from previous and ongoing studies presented at a meeting in Arizona on April 4, 2016.  (Doc. 30, ¶ 37; Doc. 33 ¶ 37.)  The Joint Committee's report primarily relied on two sources:  Carter et al. (2016) (Carter Report) and Copus, et. al. (2016) (Copus Report).[15]  (Doc. 27, ¶ 16; Doc. 31, ¶ 16.)  Neither the Carter Report nor the Copus Report were peer-reviewed at the time the Joint Committee issued its final report.  (Doc. 27, ¶ 89; Doc. 31, ¶ 89.)

**FWS reopens the comment period a second time.**

On September 9, 2016, shortly after the Joint Committee's report, AGFD requested that FWS withdraw the proposed rule because the headwater chub no longer met the definition of species under the Act and because the lower Colorado River basin roundtail

---

[15] The Joint Committee's Report reflects that Copus was contracted by AGFD with the Joint Committee's encouragement to analyze morphological variation and to conduct a genetic analysis using next-generation sequencing on samples of Gila from the lower Colorado River basin.  (E028005.)   Additionally, four of the five authors of the Carter report, including Carter, were AGFD employees at the time the report was written.  (*See* R002727.)

chub DPS's range was increased by the inclusion of the headwater chub and Gila chub. (Doc. 27, ¶ 69; Doc. 31, ¶ 69.)  AGFD also sought delisting of the Gila chub because it was no longer recognized as a separate species.  (Doc. 27, ¶ 70; Doc. 31, ¶ 70.)

In a September 14, 2016 internal document, FWS identified a number of scenarios for moving forward.  (Doc. 27, ¶ 71; Doc. 31, ¶ 71; *see also* E031346 ("Scenario planning for chubs based on AFS [the Joint Committee's] new taxonomic classification.").)  The parties agree that all of the scenarios included withdrawing the proposed rule for listing the headwater and LCR roundtail chub DPS if the agency accepted the taxonomic revision. (Doc. 27, ¶ 72; Doc. 31, ¶ 72.)  CBD asserts that FWS identified the scenarios prior to submission of other substantive comments, including comments from CBD.  (Doc. 27, ¶ 71.)  FWS points out that one of the scenarios, Option 2, addressed the possibility that: "Additional credible information is received that refutes the AFS decision to a degree that we decide to continue to treat the complex as 3 species."  (Doc. 31, ¶ 71.)

In a September 2016 email discussing "[d]raft scenarios of path forward for chubs," one FWS staff member recognized that a listing could still be warranted under the revised taxonomy:

> We are in the late stages of a proposed listing that could likely have put all three of these "entities" on the list, and there is at least some concern that even if combined the larger entity would warrant listing, as threatened at least. Thus, it seems imprudent to delist the Gila chub before a status review of the larger entity. As noted, if that review were to determine a need for listing the entire entity, either due to SPR[16] or across its entire range, years may be lost in terms of conservation due to the new national listing workplan. If the status review were to result in a determine [sic] the entire entity warrants listing, we would have at least one part of the entity listed and may be able to do a revised listing for the entire entity more quickly than waiting for years to cycle through the listing workplan, losing precious conservation

---

16 "SPR" stands for "significant portion of its range." 16 U.S.C. § 1532(6), (20). SPR is another basis on which to list a species as endangered or threatened.   It shares some similarities with a DPS analysis.  *See* Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species," 76 Fed. Reg. 76,987, 97,997–99 (Dec. 9, 2011) (explaining the difference between a "significant portion its range analysis" and a DPS analysis).

time and options.

*** 

Even if we accept that the 3 comprise only one taxon, it is still entirely possible that one or more of these entities could constitute a SPR, leading to the need to list the entire taxon.

(E0031405-6; *see also* Doc. 33, ¶ 76 (citing E0031406).)

In September 2016, FWS also sought the opinion of Dr. Thomas Dowling, a leading roundtail chub expert, concerning the Joint Committee's and Copus's reports.  (Doc. 30 ¶ 52 (citing E028178); Doc. 33, ¶ 52; *see also* Doc. 27, ¶ 89; Doc. 31, ¶ 89.)  Dr. Dowling responded that "[t]he Copus report is flawed in both the morphological and molecular analyses[,]" and that he was "'perplexed that the committee focused their report on presentations and non-peer reviewed literature (like the Carter and Copus reports) that supported their viewpoint but did not address others[17] that were not consistent with their case.'" (Doc. 33, ¶ 52 (quoting E028176–77).)  Dr. Dowling concluded: "'The bottom line is that I think that this is a snap decision that has not really addressed all of the available (or best) scientific data. Given, the significance of the action, I think it is essential that the species continue to be recognized as distinct and more information be gathered.'"  (*Id.* (quoting E028177).)

In October 2016, Arizona FWS Field Supervisor Steven Spangle acknowledged disagreement within the FWS itself, stating "'we have one camp who says the chub should be one species, and another camp who says they should be separate.'"  (Doc. 27, ¶ 101 (quoting E028674); Doc. 31, ¶ 101.)

On October 31, 2016 or November 1, 2017,[18] FWS reopened the comment period

---

[17] Dr. Dowling identified the "[o]ther" information not addressed by the Joint Committee as Tyler Chafin's presentation to the Joint Committee "where he was able to find differences," Matt O'Neill's presentation of a "morphological study where he showed he could discriminate among them," and Dr. Dowling's presentation of his work in Fossil Creek showing that robusta and nigra are not ecologically equivalent in that stream and exhibit some reproductive isolation which are two hallmarks of valid species.  (E028176-E028177.)  Dr. Dowling also mentioned that his work had been accepted for publication in Transactions of the American Fisheries Society.  (E028177.)

[18] The parties agree that the comment period was reopened on one of these dates. (Doc. 30, ¶ 47 (citing D000693); Doc. 33, ¶ 47; Doc. 27, ¶ 63 (citing D000695); Doc. 31,

for another 45 days to provide the public with additional time to review and consider the proposed rulemaking in light of the Joint Committee's taxonomic revision.  (Doc. 30, ¶ 47; Doc. 33 ¶ 47; Doc. 27, ¶ 63; Doc. 31, ¶ 63.)  FWS stated in the notice of reopening that "[t]his new information could be of significant consequence in our final listing determination because our proposed rule reviewed these entities as separate species.  Given the new information, we must now review the proposed entities' validity as recognized species.  Further, this information was not previously included or considered in our proposed rulemaking or made available to the public."  (D000696.)

**Information FWS received during the comment period.**

Some commenters supported the taxonomic revision and requested that FWS withdraw the proposed rule.  (Doc. 30, ¶ 48; Doc. 33, ¶ 48.)   The State of New Mexico Department of Fish and Game '"urge[d] the Service to reinitiate the Species Status Assessment (SSA) process to reevaluate the current status of the Roundtail Chub in the [lower Colorado River] basin'" in light of the new single species taxonomic revision. (Doc. 33, ¶ 48 (quoting D000703).)  Other commenters criticized the taxonomic revision and requested that FWS issue a final rule listing the roundtail chub DPS.  (Doc. 30, ¶ 49; Doc. 33, ¶ 49.)

FWS sought the assistance of the Service's Conservation Genetics Community of Practice (Community of Practice or COP) in evaluating the Joint Committee's taxonomic report.[19]   (Doc. 30 ¶ 51; Doc. 33. ¶ 51.)  In response, in December 2016, the Community of Practice sent FWS a report stating in part:

> The long history of these species being identified as a "species complex" should not be discounted – it's likely that incomplete lineage sorting is confounding how people interpret the genetic data. Effects of habitat alteration and climate change may also exacerbate the interpretation. The

¶ 63.)

[19] The Community of Practice is "an interactive forum to facilitate the exchange of information and technologies to strengthen the use and understanding of the conservation genetics within the [Service]."  (Doc. 29, p. 15 n. 4  (internal quotation marks and citation omitted).)

1
2
3
4
5
6

decision to lump the species into a single species may be premature given that there are genetic studies ready for peer review. In view of the consequences of a decision to lump the species together, it would be prudent to consider new genetic information before issuing a final decision that combines these different entities into one taxonomic unit. The process of peer-review in terms of the additional literature should be allowed to progress before FWS makes a decision as there appears to be genetic data suggesting differentiation. [20]

7
8
9
10

(Doc. 31, ¶¶ 95, 96 (both quoting E029478); Doc. 27, ¶¶ 95, 96.)  The parties agree that the Community of Practice criticized the great weight the Joint Committee placed on morphological analysis despite several studies suggesting "genetic divergence among the species in question."  (Doc. 27, ¶ 97; Doc. 31, ¶ 97.)

11
12
13
14
15
16
17
18

CBD highlights criticism from various commenters about the taxonomic revision. CBD, itself, commented that if FWS no longer recognized the roundtail chub, headwater chub, and Gila chub as distinct, the ESA still requires the agency to provide a determination as to whether listing the lower Colorado River basin population of roundtail chub as a threatened or endangered DPS is warranted, "'as the Service has already recognized the species as being distinct in the lower and upper basins and it faces threats such that it warrants listing as a threatened or endangered species.'"  (Doc. 27, ¶ 64 (quoting D000714); Doc. 33, ¶ 64.)

19
20
21
22
23
24
25

Other comments cited by CBD include Dr. Dowling's criticism of the Copus and Carter reports on which the Joint Committee based its finding.  (Doc. 27, ¶ 89; Doc. 31, ¶ 89.)  Dr. Dowling concluded that even if the three taxa are considered to be a single species, the single species would still be entitled to ESA protection.  (Doc. 27, ¶¶ 115, 116; Doc. 31, ¶¶ 115, 116.)  In fact, Dr. Dowling stressed that the taxonomic revision "'does not negate the fact that the complex as a whole has lost 85-95% of its range."  (Doc. 27, ¶ 115; Doc. 31, ¶ 115.)

26
27
28

---

[20] Because Defendants contend CBD's statements of fact at paragraphs 95 and 96, concerning the Community of Practice's report are inaccurate and incomplete, the Court sets forth the pertinent portion of the report as quoted in Defendants' Controverting Statement of Facts.  (Doc. 31, ¶¶ 95, 96.)

University of Arizona ecology professor Dr. Peter N. Reinthal commented that "'regardless of one (*Gila robusta*) or three species, all populations of the Gila chub complex warrant being listed as threatened." (Doc. 27, ¶ 116 (quoting D000699); Doc. 31, ¶ 116.) Dr. Reinthal further stated, "'There is no question that the entire Gila chub complex is under great threat from a combination of habitat alteration, de-watering, population segmentation, exotic species, and a variety of threats' which continue to threaten the lower Colorado River basin roundtail chub's continued persistence in the wild." (Doc. 27, ¶ 116 (quoting D000699); Doc. 31, ¶ 116.) Dr. Reinthal found "that the whole case reaches the irreversible decision that these populations of all chub are extremely threatened," and that "[t]here is no escape from the conclusion that all populations, regardless of the number of species (taxa) within the chub complex, should be afforded protection as threatened species.'" (D000700; Doc. 27, ¶ 116 (quoting D000700); Doc. 31, ¶ 116.)

CBD also cites a statement from a senior forensic scientist within FWS, Dr. Mary Kay Burnham Curtis, who wrote:

> It seems like the decision to lump the species into one might be a little premature given that there are genetic studies ready for peer review. In my opinion, that process should be allowed to progress before FWS makes a decision.

(Doc. 27, ¶ 99; Doc. 31, ¶ 99 (quoting E029410).)

Defendants generally agree with CBD's assertion that FWS "experts cautioned against discounting the long history of the three species being a part of a species complex and the evidence of genetic divergence amongst the three species." (Doc. 27, ¶ 100; Doc. 31, ¶ 100.) Defendants object only to CBD's use of the word "cautioned." (Doc. 31, ¶ 100.)

### e.      FWS's decision to withdraw the proposed rule.

On January 9 and 10, 2017, FWS met "to discuss and evaluate the various genetic reports to determine the best available science" and to finalize a recommendation to the Regional Director on how to proceed regarding the chub taxonomy.[21] (Doc. 33, ¶ 55; *see*

---

[21] Defendants state that at the meeting, FWS considered "the Community of

1    *also* Doc. 30, ¶ 55.)  At this meeting, eight of the eleven FWS staff members voted to

2    accept the single-species recommendation presented in the Joint Committee's report.

3    (Doc. 30, ¶ 56; Doc. 33, ¶ 56.)   After the decision to adopt the Joint Committee's

4    taxonomic revision, FWS considered whether to delist the Gila chub.  (*See* Doc. 27, ¶ 88;

5    Doc. 31, ¶ 88.)[22]

6        In a January 27, 2017 briefing letter for the Assistant Regional Director, Field

7    Supervisors Susan Milsap of New Mexico and Steve Spangle of Arizona recommended

8    Practice's report, and all other information and comments it had received on the taxonomic
     revision . . . ."  (Doc. 30, ¶ 55 (citing E029507, E029496).)   CBD disputes this statement
9    as "generalized" because the supporting evidence offered by FWS is the edited draft agenda
     for the meeting.  (Doc. 33, ¶ 55.)  The draft agenda identified the following documents as
10   "Key Pre-Reading[:]"  an unidentified "Guidance document"; the Joint Committee's
     September 1, 2016 report; a draft manuscript titled "Taxonomy of *Gila* in the Lower
11   Colorado River basin of Arizona and New Mexico or (Recent decisions on taxonomy of
     North American fishes by the AFS/ASIH Joint Committee on the Names of Fishes)";  the
12   Community of Practice's  December 14, 2016 report; Marsh et al 2016, *Molecular genetics
     informs spatial segregation of two desert stream Gila*, Transactions of the American
13   Fisheries Society; and comments from CBD (dated December 12, 2016), Peter Reinthal
     (dated December 2, 2016), AGFD (dated December 16, 2016), New Mexico Department
14   of Game and Fish (dated December 6, 2016), and Dowling (dated December 10 and 17,
     2016).  (E029506-8.)  The record also contains a shorter version of the agenda which,
15   according to CBD, may be an earlier draft.  (E029496-7; Doc. 33, ¶ 55.)

16       [22] In an internal communication, FWS identified  four possible scenarios for
     resolving the status of the currently-listed Gila chub, including advantages and
17   disadvantages for each approach.  (E031421-23.)  The options ranged from delisting the
     Gila chub and withdrawing the proposed listing for the headwater chub and LCR roundtail
18   chub DPS to publishing a "correction" to the list of threatened and endangered wildlife
     changing the Gila chub from a full species to a DPS of the roundtail chub.  (*Id.*)  Upon
19   consideration of all listed options, FWS field supervisors recommended to withdraw the
     proposed rule and to delist the Gila chub at the same time or as soon as possible thereafter.
20   (*Id.*)
          An early draft of the withdrawal of the proposed rule included FWS's
21   recommendation to publish "a proposed rule to delist Gila chub either concurrently with or
     as soon as possible thereafter, our withdrawal of the proposed rules for the headwater chub
22   and the roundtail chub DPS."  (E030631.)  A later draft stated: "Following publication of
     this withdrawal, we intend to reevaluate Gila chub status under the Act in the near future
23   and initiate a range-wide species status assessment (SSA) of the newly-recognized
     roundtail chub (*Gila robusta*)."  (*Id.*) A March 2017 email shows "that the regional director
24   of the Service wanted a 'stronger' statement regarding the Gila chub's withdrawal than that
     the Service would 'reevaluate the status of the Gila chub.'"  (*Id.*) The email continues:
25   "[A]nd that whomever altered the language from a previous draft 'should plan on chatting
     with the RD.'"  (Doc. 27, ¶ 88 (quoting E030631).)  Ultimately, the published notice
26   withdrawing the proposed listing for the headwater chub and lower Colorado River basin
     roundtail chub DPS stated that FWS intended to "'reevaluate the status of the Gila chub
27   (currently listed as endangered) in the near future'" and to "'initiate a range-wide species
     status assessment (SSA) of the newly recognized roundtail chub (*Gila robusta*).'"  (Doc.
28   30, ¶ 70 (quoting D000750); Doc. 33, ¶ 70.)

that the Regional Director withdraw the proposed rule, writing:

> The Service listing team recently met to discuss all available commercial and scientific information (including the AFS/ASIH's final report, public comments, and the COP report), and although there was some dissent, the Field Supervisors recommend accepting the "single species" recommendation. All agreed that AFS/ASIH is the recognized authority in establishing fish taxonomic status (as we stated inin [sic] the October 7, 2015 proposed rule); and therefore, we relied heavily on their final conclusion.

(Doc. 30, ¶ 57 (quoting D000741); Doc. 33, ¶ 57.)   The briefing letter recommended delisting the Gila Chub.  (D000741).)

### f.      FWS's Withdrawal of the Proposed Listing in 2017.

On April 7, 2017, almost 15 years after CBD filed its petition, FWS withdrew the proposed rule to list the headwater chub and LCR basin roundtail chub DPS as threatened species under the ESA.  (Doc. 30, ¶ 58; Doc. 33, ¶ 58.)  The FWS stated:  "'These fish are now recognized as a part of a single taxonomic species—the roundtail chub (*Gila robusta*). Because the entities previously proposed for listing are no longer recognized as species, as defined by the Act, we have determined that they are not listable entities and we are withdrawing our proposed rule to add them to the List of Endangered and Threatened Wildlife.'" (Doc. 30, ¶¶ 59 (quoting D000745);  Doc. 33, ¶ 59; Doc. 27, ¶¶ 74, 105; Doc. 31, ¶¶ 74, 105; *see also* Doc. 30, ¶ 60 (quoting D000750); Doc. 33, ¶ 60.)

The withdrawal of the proposed rule included a summary of the data underlying the taxonomic revision, including data relating to the species history, morphology, genetics, speciation, and conservation implications, and addressed peer review and public comments.[23]  (Doc. 30, ¶ 61; Doc. 33, ¶ 61.)

In the withdrawal of the proposed rule, FWS explained that the Service lacked confidence in the taxonomic classification of three Gila species because the classification

---

[23] While CBD agrees that the withdrawal of the proposed rule contained the summary of data included in ¶ 61 of Defendants' Statement of Fact, CBD contends that the withdrawal failed to include an adequate summary of the conservation implications of the taxonomic revision and failed to meaningfully address comments regarding listing alternatives.  (Doc. 33, ¶ 61.)

was based on an assumption (that none of the species occurred in the same locality) that has since been called into question. (Doc. 30, ¶ 63; Doc. 33, ¶ 63; *see also* D000750.)  More recent studies show that the three entities "'overlap geographically or occur adjacent to one another' and that the key for identification of the three entities did 'not reliably differentiate among these three fish' and that recent genetic studies were also unable to 'identify genetic markers distinguishing between the three fish.'"  (Doc. 30, ¶ 64 (quoting D000750); Doc. 33, ¶ 64.)  FWS acknowledged: "'As noted by nearly all researchers investigating the systematics of *Gila* spp., the taxonomic situation is complicated and problematic'"; "'[r]ecent and ongoing genetic and morphologic analyses of chubs in the Gila River basin continue to yield conflicting results.'"  (Doc. 30, ¶ 65 (quoting D000745 (citing to genetic and morphologic studies done by experts, including Dr. Dowling, that show "conflicting results" to those relied upon by the Joint Committee)); Doc. 33, ¶ 65; *see also* Doc. 27, ¶ 76; Doc. 31, ¶ 76.)[24]  FWS noted that the three chubs had been recognized as "full species, . . . as different species, subspecies of *Gila robusta*, or as part of a '*Gila robusta* complex.'"  (Doc. 27, ¶ 75 (quoting D000745); Doc. 31, ¶ 75.)

In the withdrawal of the proposed rule, FWS addressed conflicts and limitations with the taxonomic data in response to comments regarding taxonomic issues. (Doc. 30, ¶ 67; Doc. 33, ¶67.)  FWS contends that it also addressed comments regarding conservation implications, pointing to the following sentences:

> The Service recognizes that multiple experts agree that conservation actions must be directed at the population level and must include consideration of the complex as a whole[.] . . . The Service's withdrawal of our proposed rule to list the headwater and roundtail chub based on new taxonomic classification does not diminish the conservation efforts of our partners to conserve this species and habitat, nor does our decision affect the State's ability to conserve this species under its own authority. The Arizona Game and Fish Department recognizes the importance of conserving the currently recognized roundtail chub population rangewide (including the formerly

---

[24] The withdrawal of the proposed rule summarized the conflicting data for each section on the history, morphology, genetics, and speciation of the roundtail chub.  (Doc. 30, ¶ 66; Doc. 33, ¶ 66.)

known headwater chub and Gila chub) and is committed to the conservation agreements and practices that have been in place since 2006[.]

(Doc. 27, ¶ 119 (quoting D000748); Doc. 31, ¶ 119; *see also* Doc. 27, ¶ 78; Doc. 31, ¶ 78 (quoting D000748).)  FWS declined to address other comments, such as those concerning threats to the fish, stating that, "'because our withdrawal is due to taxonomic revision, such comments are outside the scope of this withdrawal'" (D000747; Doc. 27, ¶ 79 (quoting D000747); Doc. 31, ¶ 79.)  FWS also noted that the ESA time limits required it to make a listing or delisting decision at that time.  (Doc. 27, ¶ 103; Doc. 31, ¶ 103.)[25]

In the withdrawal of the proposed rule, FWS recognized that the Gila chub (*Gila intermedia*) – already listed as an endangered species under the ESA – is also part of the same taxonomic species, roundtail chub (*Gila robusta*).  (Doc. 30, ¶ 68; Doc. 33, ¶ 68.)  FWS indicated that: "'An assessment of the entire range of the new taxonomic group of roundtail chub is planned.  We are initiating a status review of the new taxonomic entity in 2 to 4 years.  Following that review, we will take action as appropriate.'"  (Doc. 30, ¶ 71 (quoting D000749); Doc. 33, ¶ 71.)

An earlier draft of the withdrawal included discussion of the Community of Practice's recommendation, including the following statement:

The COP identified some genetic divergence among roundtail, headwater,

---

[25] The notice stated:

The Act requires that we finalize, modify, or withdraw the proposed rule within 12 months. The Act provides for one 6-month extension for scientific uncertainty, which we have used. As such, we are required to make a decision regarding the entities' eligibility for listing at this time. In addition, section 4(b)(1)(A) of the Act requires the Service to make listing or delisting decisions based on the best scientific and commercial data available. . . . After reviewing the best available scientific and commercial information (as described above in the *Taxonomy* section and summarized below) and applying statutory and regulatory guidance, we determined that the Societies' report considered the best commercial and scientific data available.

(D000749-50.)

- 28 -

and Gila chub. Specifically, the COP identified that some populations of these fish are clearly genetically variable, even though the variation is greater within individual populations of fish than between the three formerly recognized species, meaning more similarities were found between species than within a given population of one species. The COP also suggested that the long history of these species being identified as a "species complex" (a group of similar fish) should not be discounted because it is likely that incomplete-lineage sorting (incomplete lineage sorting can produce discrepancies between the evolutionary tree for a specific gene or a genomic segment and the overall species-level evolutionary tree) is confounding the interpretation of the genetic data. The COP also noted that several of the reports relied on by AFS/ASIH are unpublished.

(E030965; *see also* Doc. 27, ¶ 102 (citing E030965); Doc. 31, ¶ 102.)  This language was omitted from the final version at the direction of FWS headquarters.  (*See* E030972.)

In 2018, Copus et al. (2018) stated that the taxonomic revision "'do[es] not indicate that protection for [*Gila robusta*] should cease.'" (Doc. 33, ¶ 74 (quoting R002947).) Copus et. al. (2018) found that the taxonomic revision did not undermine "'the need for protection at a population level[,]' and recommended that *Gila robusta* be managed as a DPS." (*Id*. at ¶ 75 (quoting R002947).)

## IV.    Argument

FWS seeks summary judgment arguing that its decision to withdraw the proposed rule was reasonable because there was insufficient evidence to justify the proposed rule.  (Doc. 29, p. 18.)  FWS asserts that (1) it was not obligated under the ESA to proceed with the listing process after the taxonomic revision because the petitioned-for DPS was no longer recognized as a species, (2) FWS's explanation for the withdrawal is adequate because the entity considered by the Service was no longer an applicable listing option under the ESA and withdrawing the proposed rule and re-assessing the newly-revised species was the only viable option for the Service, and (3) FWS could not have completed a new DPS analysis in the amount of time statutorily allowed.  (Doc. 29, pp. 30-38.)

In its Motion for Summary Judgment, CBD asserts that FWS's withdrawal of the proposed rule to list the LCR roundtail chub DPS rests entirely on FWS's acceptance of the taxonomic revision concluding that the Gila chub, headwater chub, and roundtail chub

1   are all roundtail chub.  (Doc. 26, p. 22.)  CBD argues that this taxonomic revision does not

2   provide a reasoned, rational basis for abandoning the listing process because the LCR

3   roundtail chub remains a listable entity and is in danger of extinction.[26]  (*Id.*)  CBD asserts

4   that FWS's failure at the time of the withdrawal  to explain why it did not consider listing

5   the LCR roundtail chub renders the withdrawal arbitrary and capricious.  (Doc. 26, pp. 31-

6   34.)  The Court agrees with CBD.

7   **V.    Analysis**

8        **A.    FWS was required to act on CBD's Petition to list the LCR basin**

9              **roundtail chub as a DPS.**

10       When a petition for designation of a DPS is submitted, the ESA mandates that FWS

11   act on that petition.  *See* 16 U.S.C. § 1553(b)(3) (requiring the Secretary to act on the

12   petition within mandatory timelines); *Coos Cnty. Bd. of Cnty. Comm'rs*, 531 F.3d at 808

13   (recognizing that when presented with a petition for listing, the Secretary's discretion is

14   "replace[d] . . .  with mandatory, nondiscretionary duties."); *Safari Club Int'l v. Jewell*, 960

15   F. Supp. 2d 17, 65 (D.D.C. 2013) (*Safari Club*) (the ESA mandates that FWS respond to a

16   petition to designate a population as a DPS under section 1533(b)(3)).  In 2003, CBD

17   petitioned FWS to list the LCR basin roundtail chub as a DPS, triggering the Service's duty

18   to consider whether the LCR basin roundtail chub population warranted listing.  16 U.S.C.

19   § 1533(b)(3) (the Secretary must act on a petition); 16 U.S.C. § 1532(16) (the definition of

20   "species" "includes . . . any distinct population segment of any species of vertebrate

21   fish . . . which interbreeds when mature.")

22       The taxonomic revision of the species roundtail chub to encompass the minnows

23   formerly recognized as the separate species of headwater chub and Gila chub did not relieve

24   FWS of its statutory obligation to consider the proposed listing.  The revision does not

25   change the fact that the LCR basin roundtail chub population remains a potential listable

26   _____

     [26]  CBD does not argue that FWS's acceptance of the taxonomic revision did not
27   rely on the best science.  Although CBD is critical of the scientific reports underlying the
     revision, CBD's argument is that FWS failed to consider the best available science, after
28   accepting the revision, in withdrawing the proposed rule. (Doc. 26, 7, 22-31; Doc. 32, p. 6
     n.1.)

entity under the ESA as a DPS of the roundtail chub.  Thus, although the data underlying FWS's consideration of that entity would necessarily need to be re-evaluated as a result of the revision, the revision did not, by itself, relieve FWS of its statutory obligation to consider the petition.[27]

### B.    FWS failed to articulate a rational connection between its acceptance of the taxonomic revision and its withdrawal of the proposed rule

In 2017, FWS abandoned the listing process before considering whether the LCR roundtail chub population remained listable as a DPS in light of the taxonomic revision. The determination whether a population is a DPS requires consideration of the population segment's (1) discreteness in relation to the remainder of the species, (2) significance to the species to which it belongs, and (3) conservation status.  (See D000755.) FWS did not consider the DPS criteria with regard to the LCR basin roundtail chub population after the taxonomic revision.

FWS asserts that it was proper to withdraw the rule because the taxonomic revision recognized only one species of Gila—the roundtail chub—instead of three species (the Gila, roundtail, and headwater chubs).  (See Doc. 29, pp. 31-32.)  FWS states that its only option was to withdraw the proposed listing because the analysis supporting the proposed listing was no longer accurate.  In the withdrawal, FWS cited the comments it received which supported the conclusion that the LCR basin roundtail chub population remained a listable entity after the revision. (See Doc. 27, ¶ 115 (Dr. Dowling stating that the taxonomic revision "does not negate the fact that the complex as a whole has lost 85-90% of its range"); see also Doc. 33 ¶ 73 (CBD's comment setting forth support for the LCR basin roundtail chub population's continued discreteness and significance following the

---

[27] FWS cites *Safari Club* as authority for the position that the Service was not obligated to analyze on its own initiative whether there is a DPS based on the newly-revised roundtail chub.  (Doc. 29, p. 32.)  *Safari Club* is inapposite.  In *Safari Club,* no party petitioned to designate a DPS and the case did not involve a taxonomic revision.  960 F. Supp. 2d at 66.  *Safari Club* merely recognized that section 1533(b) permits listing either on the Secretary's own initiative or upon a petition, and if no petition has been filed, the agency is not required to consider designating a DPS on its own.  *Id.* at 65.  Notably, *Safari Club* was clear that when the Secretary is petitioned to designate a DPS, as in this case, "the ESA mandates that the FWS respond to the petition."  *Id.*

revision and noting that the combined population remained "clearly at risk of extinction in all or a significant portion of its range.").)   But FWS did not state in its withdrawal, and the administrative record does not show, why the Service could no longer consider whether the LCR roundtail chub recognized in the revision satisfied the DPS criteria.   The withdrawal does not state how the information in the agency's possession was insufficient to conduct the analysis or how the best available science no longer justified listing the LCR basin roundtail chub as a DPS.   *See Motor Vehicle Mfrs. Ass'n of U.S., Inc*., 463 U.S. at 50 (refusing to consider reasons that were not the agency's reasons for its determination where the agency submitted no reasons at all).   Notably, FWS does not show that any of the studies supporting the revision called into question whether the LCR basin roundtail chub remains discrete and significant following the taxonomic revision.   And, despite FWS's prior determination that the Gila, headwater and LCR basin roundtail chub each faced multiple threats, FWS declined to address comments concerning threats to the fish, either separately or as a whole, as beyond the scope of the withdrawal because withdrawal "is due to taxonomic revision."   (D000747.)

In its cross-motion for summary judgment, FWS argues that a taxonomic revision necessarily affects the analysis of the DPS under both the discreteness and significance prongs.   (Doc. 29, p. 33; Doc. 34, p. 13.)   In support, FWS points to AGFD's comment that "[t]he basis of the original petition and subsequent findings and analyses by the Service for Roundtail Chub are no longer valid because they did not encompass the entire range of the species, which in Arizona alone substantially increases their range to more than 70 streams at present."   (Doc. 29, p. 33.)   FWS also cites a Service visual showing the ranges of Gila, headwater and roundtail chubs in the lower Colorado River basin prior to the taxonomic revision. (*Id.*)

The Court recognizes that a taxonomic revision could impact a DPS analysis, and would have required re-analyzing the data underlying the proposed rule in this case. FWS proves this point in its Reply, citing to parts of the administrative record that demonstrate that, even before the taxonomic revision, the Service was considering what additional

analysis would be required if the DPS of the LCR basin roundtail chub were reconfigured. (Doc. 34, p. 13.)  This includes a March 2016 draft paper discussion of alternative DPS configurations (for example whether there were 3 DPS of the roundtail chub instead of 1 in the lower Colorado River basin), and a July 2016 Service personnel discussion in response to comments about the configuration of the DPS.  In July 2016, Service personnel discussed that "1) reconfiguring the DPS would require additional analysis to determine if a potential LCR DPS would be significant and 2) [a]ny change in the DPS boundaries would require a republication of a proposed rule for notice and comment. And also a reconsideration of the status of those DPSs (threatened, endangered, or not warranted.)" (*Id*. at pp. 13-14 (internal quotation marks omitted).)  But while both of these discussions acknowledge that further analysis would be necessary if the DPS were reconfigured, neither suggests that the analysis could not be done using information available to FWS. Moreover, these documents show that FWS was aware, before accepting the taxonomic revision, of the possibility that any change in DPS would likely require a revised DPS analysis.

Thus, although FWS argues that the record demonstrates that it carefully considered its options when presented with the Joint Committee's report, and that it did not leap to the conclusion that withdrawal of the proposed rule was warranted, the only reason it gave for withdrawing the rule was its acceptance of the taxonomic revision.  That reason, in and of itself, is insufficient.  The taxonomic revision does not address whether the LCR basin roundtail chub was a listable DPS.

Taxonomic uncertainty as to roundtail, headwater and Gila chub in the Colorado River basin has always existed. Taxonomic fluidity is not uncommon in species classification efforts.  *See e.g., Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1260 (11th Cir. 2007) ("Given the nature of taxonomy, it would be surprising if there were not some disagreement about the proper classification of the [entity at issue] . . . ."). Because FWS did not explain how this taxonomic revision impacted the DPS analysis, how it excused the Service from considering the DPS criteria, or why FWS could not re-visit

the DPS analysis in light of existing data, this Court cannot conclude that FWS was unable to fulfill its statutory mandate to determine whether the population was a listable DPS in light of the taxonomic revision.

### C.     FWS did not rely on ESA time limits to abandon the listing process.

In its cross-motion for summary judgment, FWS argued that it withdrew the proposed listing because, in light of the taxonomic revision, it lacked sufficient time to complete the analysis required under the ESA. (Doc. 29, p. 32.)   In its reply, FWS acknowledged that it withdrew the proposed rule solely because the roundtail chub DPS was no longer considered a species under the ESA. (Doc. 34, p. 18.)   Nonetheless, FWS suggests that its inability to have issued a final rule with a revised analysis within the statutory timeframe even if it choose to do so—as opposed to being required to under the ESA— is further evidence demonstrating that the Service acted reasonably in withdrawing the proposed rule. (*Id.*)

The Court agrees that FWS did not rely on ESA time limits as a basis for withdrawing the proposed listing.  Although the notice of withdrawal alludes to time limitations imposed by the ESA, the notice states only that the taxonomic revision was the basis for the withdrawal of the proposed rule.  (D000749-50.)  Accordingly, the Court will not consider the time limits in support of FWS's withdrawal of the listing.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 50 (refusing to consider reasons that were not the agency's reasons for its determination where the agency submitted no reasons at all).   But the agency's reference to the ESA time limits bears mention.

It is not apparent that FWS did not have time, in light of its adoption of the taxonomic revision, to analyze the data underlying the petition. Clearly, FWS was aware of the possibility of reconfiguration of the DPS.  As discussed above, prior to the taxonomic revision, FWS personnel discussed in March 2016 whether there were three distinct population segments of roundtail chub instead of one in the lower Colorado River Basin and discussed in July 2016, possible alternative DPS configurations, including "separate DPS for the LCR populations."

FWS is silent as to how much time would be needed to complete a DPS analysis. In August 2016, FWS extended the deadline for making a final determination based on its finding that there was "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to" the proposed rule. (Doc. 30, ¶¶ 32, 33; Doc. 33, ¶¶ 32, 33.) At that point, FWS had eight months to make a listing determination. (Doc. 32, p. 15.) FWS accepted the taxonomic revision five months later—leaving three months to consider a DPS analysis.

Even if FWS could not complete its analysis within the statutory time limits, that would not provide evidence that FWS acted reasonably in withdrawing the rule and refusing to consider the petition further. The reasons for agency decisions must be based on non-arbitrary, relevant factors that are tied to the purpose of the underlying statute. *See Judulang*, 565 U.S. at 53, 55. Congress enacted ESA's listing deadlines due to "particular concern for species that had languished for years in 'status reviews.'" *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 839–40 (9th Cir. 2001) (citation omitted). It would defeat the Congressional intent behind the ESA deadlines if the Service could decline to even consider a listing if it determined that it did not have sufficient time to do so under the ESA deadlines. And it would not be rational to abandon consideration of a listing based on the statutorily-mandated deadlines. "The Endangered Species Act does not require that a species be destroyed in order to preserve a part of the process meant to save it." *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1269 (rejecting plaintiffs' request for order requiring the Service to re-start the listing process as a penalty for its failure to comply with ESA's deadlines because that could condemn the Alabama sturgeon to extinction and would defeat the Congressional intent behind the ESA.)[28]

//

---

[28] FWS asserts that *Alabama-Tombigbee Rivers Coal.* is distinguishable because the plaintiffs, a group of industries and associations opposed to listing, had ulterior motives in requesting FWS to re-start the listing process, and no such motives can be attributed to FWS. This is a distinction without a difference. If FWS could escape its statutory obligations in instances where more time was required to complete those obligations than permitted by the ESA, the ESA would be eviscerated.

- 35 -

### D.   Conclusion

For the forgoing reasons, the Court concludes that FWS's withdrawal of the proposed rule was arbitrary and capricious.  FWS improperly failed to consider whether the LCR basin roundtail chub population remained discrete, significant, and in danger of extinction after FWS's acceptance of the taxonomic revision, and FWS failed to articulate a rational connection between the taxonomic revision and its decision not to consider listing the LCR basin roundtail chub DPS.  The Service could have explained why the taxonomic revision necessitates denying the LCR basin roundtail chub protection under the Act.  The Service could have explained that the best available science demonstrates that the LCR basin roundtail chub is no longer in danger of extinction in the foreseeable future.  But the Service failed to do so, rendering the withdrawal arbitrary and capricious.

Accordingly, the Court will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

IT IS ORDERED:

1.     Pursuant to Rule 25(d), Fed. R. Civ. P., Secretary of the Interior Deb Haaland is substituted in place of Defendant Ryan Zinke.

2.     Plaintiff's Motion for Summary Judgment (Doc. 25) is GRANTED.

3.     Defendants' Cross-Motion for Summary Judgment (Doc. 28) is DENIED.

//
//
//
//
//
//
//
//
//
//

- 36 -

4.      The withdrawal of the proposed rule to list the lower Colorado River basin roundtail chub DPS is VACATED.  Upon receipt of this Order, the U.S. Fish and Wildlife Service must promptly commence a status review of the lower Colorado River basin roundtail chub population *and* within one-year of the filing date of this Order, FWS must issue a 12-month finding regarding whether the listing of the lower Colorado River basin roundtail chub as an endangered or threatened DPS is warranted.  16 U.S.C. § 1533(b)(3)(A)-(B). If such listing is warranted, FWS shall issue a final rule in accordance with. 16 U.S.C. § 1533(b)(6).

Dated this 31st day of March, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge